IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LAURA ANN HOLIZNA, et al.,

                 Plaintiffs,

v.                                       CIVIL ACTION NO. 2:12-cv-06173

BOSTON SCIENTIFIC CORP., et al.,

                 Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Proxy Biomedical, Ltd.'s ("Proxy Ltd.") Motion to Dismiss Plaintiffs' Complaint [Docket 26]. The plaintiffs responded to the Motion [Docket 41] and Proxy Ltd. replied to the response [Docket 42], making the Motion ripe for decision. Proxy Ltd. seeks an Order dismissing all of plaintiffs' claims against it for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. This court **FINDS** that there is a lack of personal jurisdiction over Proxy Ltd. and **GRANTS** the Motion to Dismiss Plaintiffs' Complaint as to Proxy Ltd.

**I.       Background**

The two plaintiffs in this case, Laura Ann and Kenneth Wade Holizna, are Georgia residents (Compl., [Docket 1], at ¶ 1). The plaintiffs originally filed their Complaint in the United States District Court for the Northern District of Georgia. The case was subsequently transferred to this district by the Judicial Panel on Multidistrict Litigation and assigned to MDL 2326, *In re: Boston Scientific Corp., Pelvic Repair System Products Liability Litigation*. Mrs.

Holizna alleges that she suffered personal injuries as a result of a Boston Scientific Corporation ("BSC") Pinnacle Pelvic Floor Repair Kit and a BSC Obtryx Transobturator Mid-Urethral Sling System that were implanted into her body at Northside Hospital—Cherokee in Canton, Georgia. (Compl., [Docket 1], at ¶¶ 10–11). The implants were used to treat her pelvic organ prolapse and stress urinary incontinence, respectively. (*Id.* at 12).

The plaintiffs allege that Proxy Ltd. designed, manufactured, packaged, and labeled Polyform Synthetic Mesh, which BSC distributes under a licensing agreement as a component of the Pinnacle Pelvic Floor Repair Kit. (Compl., [Docket 1], at ¶ 5). They do not contend that Proxy Ltd. had any involvement with the Obtryx mesh implanted in Mrs. Holizna in this case. The plaintiffs allege that Proxy Ltd. has sufficient contacts with Georgia to allow the transferor court in Georgia to exercise personal jurisdiction over it under the theories of both general and specific jurisdiction. (Compl, [Docket 1], at ¶ 7).

### a.   Proxy Ltd.

Proxy Ltd. is an Irish public limited company, and its principal place of business is in Galway, Ireland. (Compl., [Docket 1], at ¶ 4). Among other types of mesh, Proxy Ltd. manufactures Polyform Synthetic Mesh ("Polyform Mesh"). Polyform Mesh is a non-absorbable synthetic mesh, constructed of knitted filaments of polypropylene. (510(k), [Docket 41-10], at 1). It is supplied in sterile, sheet form to be cut to size and sutured by a surgeon to meet an individual patient's needs. (*Id.*) Polyform Mesh is a *finished* product that is distinct from the Pinnacle and Obtryx devices at issue in this suit. (Interrogatories, [Docket 41-3], at 3). Proxy Ltd. also sells "bulk non-sterile polypropylene mesh that has physical properties equivalent to Polyform Mesh as a component for the Pinnacle device" to a contract manufacturer for BSC. (*Id.* at 8). The contract manufacturer places orders with Proxy Ltd. in Ireland based on information it

receives from BSC. (*Id.*) Then, the contract manufacturer incorporates the bulk, non-sterile polypropylene mesh into its Pinnacle device in Jeffersonville, Indiana, and sells the finished product to BSC. (*Id.*) Proxy Ltd. derives no income from the sale of the finished Pinnacle devices. (*Id.* at 9).

### b.  Proxy Synthetic Mesh Versus Bulk Mesh

The Executive Director of Proxy Ltd., Peter Gringas, explained the difference between Polyform Mesh and the bulk product:

> Unlike Polyform Mesh, the bulk, non-sterile polypropylene mesh Proxy Ltd. provides for use as a component part in BSC's Pinnacle . . . cannot be sold to an end user or implanted in a human absent additional steps in the manufacturing process. Specifically, before the bulk, nonsterile polypropylene mesh supplied by Proxy Ltd. can be used as a component of Pinnacle, that mesh needs to be further processed after leaving Proxy Ltd.'s control by the addition of sleeves, dilators, leads, sutures, needles, barrier packaging, sterilization, and instructions for use, including indications for use and warnings, and instrumentation are also added.

(Supp. Decl. of Peter Gringas, [Docket 42-2], ¶ 4).

Proxy Ltd. entered into a distribution agreement with BSC in 2005. (Distribution Agreement, [Docket 41-1]). The only product that was the subject of the cited distribution agreement between Proxy Ltd. and BSC was Polyform Mesh. (Supp. Decl. of Peter Gringas, [Docket 42-2], at ¶ 9). The agreement was entered into before Proxy Ltd. had any role in supplying component parts for any BSC product, including Pinnacle. (*Id.* at ¶ 10). Subsequent amendments to the agreement have occurred, but were not inquired into by the plaintiffs. (App'x A, [Docket 42-3], at 3). The plaintiffs had the opportunity to depose Peter Gringas, but canceled the deposition. [Docket 39]. The licensing agreement (entitled "Distribution Agreement") provides that BSC "shall use commercially reasonable efforts to launch and market the Product in the Field in the United States and Europe." (Distribution Agreement, [Docket 41-1], at 5).

### c.  Proxy Ltd.'s Contacts with Georgia

Peter Gringas, on behalf of Proxy Ltd., attended a Society for Biomaterials Meeting on Translational Research in Atlanta, Georgia in 2008. (Interrogatories, [Docket 41-3], at 19). A meeting schedule for Proxy Ltd. also includes two meetings in Atlanta in 2005. (Meeting Schedule, [Docket 41-54], at 3). Gringas's declaration states that Proxy Ltd. only attended the 2008 conference; and neither Proxy Inc. nor Proxy Ltd. attended the 2005 conference. (Supp. Decl. of Peter Gringas, [Docket 42-2], at 5).

Proxy Ltd. also entered into a Materials Transfer Agreement with CryoLife, Inc., a Georgian entity unrelated to this suit, in which Proxy Ltd. agreed to perform an evaluation of a material that is not at issue in this litigation, porcine peritoneum. (Materials Transfer Agreement, [Docket 41-56], at 4). With respect to claims arising from or related to this agreement with CryoLife, Proxy Ltd. agreed to submit to the jurisdiction of the state and federal courts of Georgia. (Materials Transfer Agreement, [Docket 41-56], at 2).

Proxy Ltd. entered into a confidentiality agreement with CryoLife. The agreement has a Georgia law choice-of-law clause in which the participants agree to consent to jurisdiction in the courts of the State of Georgia or the United States District Court for the Northern District of Georgia with respect to disputes arising out of the Agreement. (Confidentiality Agreement, [Docket 41-57], at 3).

Finally, Proxy Ltd. entered into a license and supply agreement with CryoLife for the purchase of BioGlue. (License and Supply Agreement, [Docket 41-55], at 1). Under the terms of this agreement, Proxy Ltd. was given a license to include BioGlue in its sale of mesh kits within Germany, the Republic of Ireland, and the United Kingdom. (*Id.* at 3–4). The agreement includes a Georgia choice-of-law provision and a provision stating that for disputes arising out of the

agreement, Proxy Ltd. submits to the jurisdiction of any state and federal courts in Cobb County in the State of Georgia, U.S.A. (*Id.* at 14).

Proxy Ltd. is without knowledge as to how many of the Pinnacle devices BSC sold in Georgia and the amount of revenue BSC derived from sales of the Pinnacle devices in Georgia. (Interrogatories, [Docket 41-3], at 8–9). From what can be discerned from the record of rather heavily redacted BSC documents, there appears to be a significant number of Pinnacle devices that were sold in the territory including Georgia from 2009 through 2010, with a sharp decline in sales in 2011. (Territory Review, [Docket 41-5], at 3). Some of those devices were sold to Northside Hospital–Cherokee. (*Id.* at 4) (the document indicates twenty-six were sold in 2009, a net of eight in 2010, and one in 2011).

## II.   Legal Standard

### a.   Choice of Law

Under 28 U.S.C. § 1407, this court has authority to rule on pretrial motions. In multidistrict litigation cases such as this, the choice-of-law for these pretrial motions depends on whether they involve federal or state law. "When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located. When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) (internal citations omitted); *Toll Bros., Inc. v. Dryvit Systems, Inc.*, 432 F.3d 564, 568 n.4 (4th Cir. 2005) (applying Connecticut state law in transferred multidistrict litigation case based on diversity jurisdiction and citing to *In re Temporomandibular Joint Implants Prods. Liab.*

*Litig.*, 97 F.3d at 1055); *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998); *see also*

15 Charles A. Wright et al., *Federal Practice and Procedure*, § 3866 (3d ed. 2009).

The Honorable Shira A. Scheindlin has made a similar observation that the law of the

transferee circuit applies:

> [C]ourts have held that the law of the transferee circuit controls pretrial issues
> such as whether the court has subject matter or personal jurisdiction over the
> action, or whether the cases should be remanded to state court because the cases
> were not properly removed.

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 439 (S.D.N.Y.

2007) (footnote omitted). Judge Scheindlin's observation, as noted in her opinion, reflects the

general approach. *See*, *e.g.*, *In re Linerboard Antitrust Litig.*, No. 04 Civ. 4001, MDL 1261, 2005

WL 1625040, at *4 (E.D. Pa. July 11, 2005) (applying the law of the Third Circuit on a motion

to dismiss for lack of subject matter jurisdiction); *In re Bridgestone/Firestone, Inc., Tires Prods.

Liab. Litig.*, 256 F. Supp. 2d 884, 888 (S.D. Ind. 2003) (applying the law of the Seventh Circuit

on a motion for remand to state court). Therefore, for the purposes of this motion, Georgia's law

will apply to the determination of whether Georgia's long-arm statute confers personal

jurisdiction over Proxy Ltd., and the Fourth Circuit's law will apply to determining whether that

conferral comports with due process under the United States Constitution.

### b.  Personal Jurisdiction

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff

ultimately bears the burden of proving to the district court judge the existence of jurisdiction

over the defendant by a preponderance of the evidence." *New Wellington Fin. Corp. v. Flagship

Resort Dev. Corp,* 416 F.3d 290, 294 (4th Cir.2005). When the court addresses the jurisdictional

question "on the basis only of motion papers, supporting legal memoranda and the relevant

6

allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Id.; see also Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). "Under such circumstances, courts 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *New Wellington,* 416 F.3d at 294 (quoting *Combs,* 886 F.2d at 676).

For a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, a state long-arm statute must authorize jurisdiction over the non-resident defendant. Second, the court's exercise of personal jurisdiction over the non-resident defendant must "comport with the Due Process Clause." *In re Celotex Corp.,* 124 F.3d 619, 627 (4th Cir. 1997); *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59–60 (4th Cir. 1993).

"A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause if the defendant has sufficient 'minimum contacts' with the forum such that requiring the defendant to defend its interests in the forum does not 'offend traditional notions of fair play and substantial justice.'" *Celotex,* 124 F.3d at 628 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). The Supreme Court has recognized that this protection provided by the Due Process Clause extends to foreign corporations. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 131 S. Ct. 2846, 2852–54 (2011).

There are two approaches to finding jurisdiction over persons outside a state's borders: specific and general jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 711 (4th Cir. 2002). If the suit does not arise out of the defendant's contacts with the state, the defendant must have "continuous and systematic" contacts with the state to confer general jurisdiction. *Id.* at 712. On the other hand, if the defendant's contact with the state is the basis of

7

the suit, then specific jurisdiction applies. *Id.* The Fourth Circuit applies a three-part inquiry to determine whether specific jurisdiction exists; the inquiry looks to: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004). The "touchstone" of the specific jurisdiction analysis is whether the defendant "engaged in some activity purposefully directed toward the forum state." *Celotex,* 124 F.3d at 628 (internal quotations omitted).

## III.   Analysis

### a.   General Jurisdiction

The plaintiffs argue that Proxy Ltd. is subject to general jurisdiction in Georgia based on Proxy Ltd.'s routine, systematic contacts with the State. Proxy Ltd. has no presence in Georgia, has entered into three contracts of limited term with a Georgia company, manufactures a component of a medical device that is indirectly sold to parties in Georgia, and is based in Ireland. Assuming Georgia's long-arm statute would permit general jurisdiction over an entity, which is not clear on its face,[1] these contacts fall significantly below the level of contacts constitutionally necessary to allow a state to have general jurisdiction over an entity. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 131 S. Ct. 2846, 2853–54 (2011) (stating that the paradigm forum for the exercise of general jurisdiction, for a corporation, is "one in which the corporation is fairly regarded as at home") (citing Lea Brilmayer et al., *A General Look at General Jurisdiction*, 66 Texas L. Rev. 721, 728 (1988), which identifies domicile, place of

---

[1] Nor is it clear under the interpretation of the long-arm statute by Georgia's courts. *See Pratt & Whitney Canada, Inc. v. Sanders*, 460 S.E.2d 94, 96 (Ga. Ct. App. 1995) ("A finding of jurisdiction over a nonresident outside the confines of the Long Arm Statute 'would result in an unconstitutionally broad construction of' the statute." (citing *State of South Carolina v. Reeves*, 423 S.E.2d 32 (Ga. Ct. App. 1992)).

8

incorporation, and principal place of business as paradigm bases for a state to exercise general jurisdiction).

### b.  Specific Jurisdiction

The Georgia Supreme Court has held that some provisions of the Georgia long-arm statute, Ga. Code Ann. § 9-10-91, do not reach defendants to the fullest extent permitted by constitutional due process. *Innovative Clinical & Consult. Svcs., LLC v. First Nat. Bank of Ames, Iowa*, 620 S.E.2d 352, 354 (Ga. 2005). In pertinent part, the Georgia long-arm statute provides that the State

> may exercise personal jurisdiction over any nonresident . . ., as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
>
> (1) Transacts any business within this state; [or]
> (2) Commits a tortious act or omission within this state . . .; [or]
> (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; . . . .

Ga. Code Ann. § 9-10-91.

The plaintiffs contend that Proxy Ltd. is subject to personal jurisdiction in Georgia under either subsection (1) or subsection (3) of § 9-10-91. The Georgia Supreme Court has construed subsection (1) to reach "the maximum extent permitted by procedural due process." *Innovative Clinical*, 620 S.E.2d at 355. It has construed subsection (3) to be more restrictive. *Id.* For the purposes of this analysis, it is assumed that Georgia state courts would find that the long-arm statute confers personal jurisdiction over Proxy Ltd. under the more expansive subsection (1). Thus, the issue turns on whether Georgia's exercise of personal jurisdiction over Proxy Ltd. is consistent with the Due Process Clause.

The first inquiry in considering the permissible reach of personal jurisdiction asks whether "the defendant purposefully availed itself of the privilege of conducting activities in the State." *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004). Proxy Ltd.'s contacts with Georgia include contracts with a Georgia entity unrelated to this suit, a conference or trade show in Georgia, and alleged injuries occurring as a result of a product that incorporated its mesh making its way to Georgia through the stream of commerce. The alleged injuries clearly do not arise out of the contracts with CryoLife, and therefore they cannot be the basis for personal jurisdiction. *Id.* (stating that the "plaintiff's claims [must] arise out of those activities directed at the State").

Although Proxy Ltd. has a distribution agreement with BSC for the territory including the United States and Europe, the agreement in the record pertained only to Polyform Mesh, not the bulk-form unfinished mesh. It appears that subsequent amendments may have covered the bulk-form mesh, but even if that were so, the agreement does not indicate Proxy Ltd.'s targeting of Georgia specifically. *See J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2790 (2011) (plurality opinion) (Kennedy, J.) (indicating that it is the defendant's purposeful contacts with the forum state, not with the United States, "that alone are relevant"). I have addressed this issue in Pretrial Order # 41, *In re: Boston Scientific Corp. Pelvic Repair Sys. Prods. Liab. Litig.*, 2:12-md-02326.

The 2008 Society for Biomaterials Meeting on Translational Research in Atlanta, Georgia would indicate that Proxy Ltd. targeted Georgia if it was determined that Proxy Ltd. promoted its products at the conference. In response to an interrogatory asking Proxy Ltd. to list "every meeting, convention or conference in the United States of any professional society, medical or scientific organization, or industry or trade organization where Proxy was an exhibitor or presenter, had a booth or similar exhibition, or otherwise disseminated information

10

about Proxy products," Proxy Ltd. included this 2008 conference in Atlanta, Georgia. (Resp. to Interrogatories, [Docket 41-3], at 17–19). Proxy Ltd. also stated that it

> has attended, through its Managing Director and other individuals, various tradeshows or conferences for the purposes of monitoring the market for biomaterial implants, minimally invasive instruments, tissue engineering materials, and pharmacology. Proxy Ltd. has disseminated limited information about MotifMESH and VitaMESH at those conferences. Prior to 2006, through its Managing Director, Proxy Ltd. attended meetings of the American Urology Association and the American Urogynecological Society for purposes of monitoring the market for womens' health. Proxy Ltd. has not exhibited, presented, or otherwise disseminated information about Polyform Mesh or polypropylene mesh at any such conference.

(*Id.*) Thus, the record does not indicate that Proxy Ltd. marketed the Pinnacle product or the bulk-form mesh that was incorporated into the Pinnacle product at the Georgia conference. Although the minimum contacts prong of the analysis is likely satisfied, the plaintiffs have not shown how the alleged injuries inflicted by the Pinnacle product, which was manufactured and distributed by separate entities, arose out of Proxy Ltd.'s possible exhibition of unknown products at the conference in Georgia. *See Mitrano*, 377 F.3d at 407 ("[P]laintiff's claims [must] arise out of those activities directed at the State."); *see also SDS Korea Co., Ltd. v. SDS USA, Inc.*, 732 F.Supp.2d 1062, 1079–80 (S.D. Cal. 2010) (finding no personal jurisdiction based on a defendant's exhibiting products at a trade show where plaintiff "[did] not assert any of its alleged injuries resulted from [the defendant's] participation in the [] trade show").

## IV.    Conclusion

For the foregoing reasons, the plaintiffs have not satisfied their burden of proving that a Georgia court would have personal jurisdiction over Proxy Ltd. in this suit. Therefore, I **GRANT** Proxy Ltd.'s Motion to Dismiss Plaintiffs' Complaint as it pertains to Proxy Ltd. The Court

**DIRECTS** the Clerk to send a copy of the Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:  April 8, 2013

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE